IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TINA L. MAGWOOD, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>) No. 2:05-cv-945<br>CHRISTINA FRENCH, ) Judge Thomas M. Hardiman<br>DR. JACQUELINE WEBB, )<br>SCHOOL DISTRICT OF DUQUESNE, )<br>)<br>Defendants. ) | |

## MEMORANDUM OPINION

**I.    Introduction**

Plaintiff Tina L. Magwood filed this civil rights action on behalf of her minor child, Allen Jackson, Jr., seeking relief under 42 U.S.C. §1983 for the repeated injuries suffered by Jackson at the hands of other students at Duquesne Elementary School (School). Defendants filed a motion for summary judgment, arguing that Plaintiff cannot succeed under the "state-created danger" and "deliberate indifference with regard to policies and/or customs" doctrines.

**II.   Facts**

This case, like many others involving the "state-created danger" doctrine, presents itself "in a most excruciating factual context." *D.R. by L.R. v. Middle Bucks Area Vo. Tech. Sch.*, 972 F.2d 1364, 1365 (3d Cir. 1992) (en banc), *cert. denied*, 506 U.S. 1079 (1993).

Defendant Jacqueline Webb, Ph.D., was Curriculum Director for the Duquesne School District (District) for two years and became Superintendent in 2003. Defendant Christina French

was Duquesne Elementary School Principal, K-5, for three years, beginning in August 2002. Plaintiff's minor son, Allen Jackson, Jr., began attending Duquesne Elementary as a third-grader during the 2002-03 school year. The District does not provide transportation for any students, so Jackson walked to and from school with his two brothers. Occasionally, Jackson's step-father picked up the children from the School, and there were no incidents of student violence while he accompanied the children.

Soon after Jackson started attending the School, a boy began pushing him on several occasions. When Jackson told his homeroom teacher that this boy "wouldn't stop picking on [him] and he kept pushing [him]," the teacher moved the boy to a desk in the back of the room in a corner. Jackson did not receive medical treatment as a result of this pushing.

When Jackson was in fourth grade, he alleges that boys identified as C.H., C.W., D.J., and J.M. chased him and his two brothers and pushed him into the bushes. Although Jackson suffered a split lip, he sought no medical treatment. After Jackson talked to the principal about this incident, the culprits were suspended for three days. Also while Jackson was in fourth grade, a different student, D.B., chased him, called him a punk, and left. That same student also chased Jackson when he was in sixth grade and then pushed Jackson's sister M.P., who retaliated. Jackson did not disclose the incidents involving D.B. to anyone at the School.

When Jackson was in fifth grade, he suffered several more instances of violence at the hands of fellow students. On one occasion, he was chased around the art room and kicked by J.M. The art teacher, Helen Kuhn, called the security guard, but she was unable to intervene to stop this incident, which required Jackson to seek medical treatment. In any event, Kuhn was not permitted under District policy to restrain the students herself using physical force. After the

incident, both Jackson and J.M. were sent to the principal's office, and Kuhn positioned herself close to Jackson thereafter. Kuhn also testified that "the children would all fight, argue, demean[, and] bully each other." A few months after this incident, a boy named D.C. chased Jackson and kicked him in the face, inflicting a big red spot over Jackson's eye. Jackson went to the hospital for treatment, and D.C. was suspended for three days. Also while he was in fifth grade, Jackson and his brothers were chased by a group of ten boys, who caught Jackson, called him names, and then ran in a different direction. Jackson was not injured as a result of this incident and did not talk with the principal about it, although other children in Jackson's class were called to the office about it. Finally, Jackson was chased around the School by a boy named R., who was holding a brick. Although Jackson was not hurt, the seriousness of this episode caused Plaintiff Magwood to request that all three of her sons be discharged early from school.

Defendant Webb had discussions with Defendant French about strategies to assist Jackson getting to and from school. They talked, *inter alia*, about the community wanting the starting and ending times for the elementary and secondary schools to be approximately the same time because "a lot of the older students were responsible for taking care of their siblings." In the end, arrangements were made with Jackson and his teachers so that he and his brothers could all leave fifteen to twenty minutes early.

Plaintiff Magwood also identified two other incidents that occurred in the cafeteria and one incident that was resolved between a boy and Jackson by the teacher in class. Another incident involved K.R. and J.M., when one boy bet the other to hit Jackson. At the time K.R. hit Jackson, he also hit Jackson's brother, J.P. Jackson's sister, M.P., then got into a fight with K.R. because he was bragging about hitting her brothers. Barbara McDonnell, the District's middle

school principal, talked with Jackson and J.P. Both K.R. and M.P. were suspended because of this incident.[1]

Plaintiff withdrew Jackson from the District half-way through sixth grade, and he currently attends cyber school. Plaintiff's four other children continue to attend the District's schools, however.

The District had a policy manual that contained the following policies. First, the policy with regard to physical altercations between students was to get a security guard and write a report. Second, any teacher who witnessed fighting would complete a report that was contained in the Teacher Handbook. Third, the teachers could have their own classroom rules and expectations, could issue discipline such as detention, extra assignments, time-outs, or other classroom management techniques short of physical restraint. If Defendant French observed a fight, however, she would physically separate the students. Fourth, in order to deal with classroom management and behavior problems, the District required training, including a "Responsive Classroom" workshop. This mandatory workshop addressed positive discipline and methods for dealing with behavioral problems.

From 2002 through 2005, the District contracted with Capital Asset Protection, Inc. to

---

[1] In her amended complaint, Plaintiff also alleges that on one occasion, Jackson "was not let out by his teacher at 2:30 p.m., and was subsequently beaten up as a direct result thereof." In her summary judgment pleadings, however, Plaintiff no longer alleges this fact, nor is this incident described in any of the record evidence. Similarly, despite one mention of "concealment" in Plaintiff's amended complaint, there is no record evidence that Defendants "concealed" any incidents involving Jackson. To the contrary, various District agents, from teachers to the Superintendent, actively addressed them through dialogue and discipline. Finally, in her amended complaint, Plaintiff states that school officials admitted to tolerating "less" when it came to student misconduct. She then argues that Defendants should have been doing something more, as opposed to simply tolerating "less." The Court is at a loss as to understand how "tolerating less" could mean anything other than "doing something more." In any event, this particular fact/argument is again nowhere to be found in the record evidence or Plaintiff's summary judgment pleadings.

4

provide security guards to deter fighting and provide a safe environment. French believed that the presence of Capital Asset security guards was a deterrent to student misconduct.[2] Nevertheless, French had concerns with security at the School and wanted not only more security guards assigned to her floors, but also to give them authority to physically restrain, issue citations to, and arrest students. To remedy these shortcomings, the District has since hired actual police officers with the additional authority, and there have been fewer incidents of violence.[3]

During the relevant time frame, the District tracked disciplinary infractions through ProSoft, a computer program. A secretary would input the data from a disciplinary referral form. In her capacity as Superintendent, Defendant Webb received monthly reports summarizing disciplinary infractions. In her capacity as Principal of Duquesne Elementary, Defendant French would print out a yearly report list of disciplinary infractions.

In addition to the reporting function, the District had a Solutions Team composed of the principal, vice principal, guidance counselor, social worker, classroom teacher, and reading specialist. The purpose of this team was to address referrals of students who were having difficulties. The District also employed a behavioral specialist who had specific training in restraining students and defusing conflicts. In addition, the District implemented a partnership with the University of Pittsburgh, wherein individuals are placed in the School and work closely with the community and parents. Among the partnership's priorities was to improve academic

---

[2] This was the one fact from Defendants' Statement of Material Facts that Plaintiff did not admit as true; however, page 40 of French's deposition transcript reflects her belief in the deterrence value of Capital Asset vis-à-vis the majority of students.

[3] Defendants argue that this is a "subsequent remedial measure" that is inadmissible under Fed. R. Evid. 407. The Court declines to decide this issue, however, because even considering this evidence, Plaintiff has not adduced sufficient evidence to survive summary judgment.

performance and student behavior using positive discipline. Finally, the District continuously made procedural changes that would assist in discipline.

### III. Standard of Review

Summary judgment is required on an issue or a claim when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986); *Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). An issue is "material" only if the factual dispute "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

"Summary judgment procedure is properly regarded not as a disfavorable procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotation marks omitted). The parties have a duty to present evidence; neither statements of counsel in briefs nor speculative or conclusory allegations satisfy this duty. *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). After the moving party has filed a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The nonmoving party must make a showing sufficient to establish the existence of each element essential to her case on which she will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

## IV. Analysis

### A. *Plaintiff Has Failed To Establish A "State-Created Danger" Claim*

Both counts of Plaintiff's first amended complaint assert claims under 42 U.S.C. §1983, which provides a civil remedy when individuals acting under color of state law deprive persons of federally protected rights. *See Parratt v. Taylor*, 451 U.S. 527, 535 (1981). Thus, "[t]he threshold issue in any [§]1983 lawsuit is whether the plaintiff has sufficiently alleged a deprivation of a constitutional right." *Rivas v. City of Passaic*, 365 F.3d 181, 193-94 (3d Cir. 2004). In the instant case, Plaintiff alleges that Defendants violated her minor son's right to bodily integrity protected by the Due Process Clause of the Fourteenth Amendment.

Generally, "the Due Process Clause does not impose an affirmative duty upon the state to protect citizens from the acts of private individuals." *Sanford v. Stiles*, 456 F.3d 298, 303-04 (3d Cir. 2006) (per curiam); *accord Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 907 (3d Cir. 1997). There are, however, two exceptions to the general rule. First, the state has an affirmative duty of care when a "special relationship" exists. Second, "the state has a duty when a 'state-created danger' is involved." *Sanford*, 456 F.3d at 304; *accord Morse*, 132 F.3d at 907. In the instant case, Plaintiff does not argue that a "special relationship" exists between Jackson and Defendants of the kind required under the first exception.[4] She does, however, allege that Defendants subjected Jackson to a danger that it created "by fostering an atmosphere that

---

[4] Any such argument is foreclosed by *D.R. by L.R.*, 972 F.2d at 1372 ("The analogy between school children and prisoners or the involuntarily committed is weakened further by the fact that school children remain resident in their homes. . . . The state did nothing to restrict her liberty after school hours and thus did not deny her meaningful access to sources of help."). The Court also notes that Plaintiff does allege a relationship to satisfy one of the elements of the "state-created danger" exception; however, the "relationship" necessary to satisfy that test is substantially easier to demonstrate than the "special relationship" required under the "special relationship" exception. *See Morse*, 132 F.3d at 912.

7

permitted fellow students to repeatedly assault him."

Last year, in *Bright v. Westmoreland County*, 443 F.3d 276 (3d Cir. 2006), the Court of Appeals analyzed in some detail the "state-created danger" doctrine. The Court of Appeals first discussed the Supreme Court decision in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), which reiterated that "the Due Process Clause did not impose an affirmative obligation on the state to protect its citizens." *Bright*, 443 F.3d at 280. Rather, "[i]ts purpose was to protect the people from the State, not to ensure that the State protected them from each other." *Id.* (quoting *DeShaney*, 489 U.S. at 196). Nonetheless, a "constitutional violation can occur when state authority is affirmatively employed in a manner that injures a citizen or renders him 'more vulnerable to injury from another source than he or she would have been in the absence of state intervention.'" *Id.* at 281 (quoting *Schieber v. City of Phila.*, 320 F.3d 409, 416 (3d Cir. 2003)).

> The four essential elements of a meritorious state-created danger claim are:
>
> > (1) the harm ultimately caused was foreseeable and fairly direct;
> > (2) a state actor acted with a degree of culpability that shocks the conscience;
> > (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
> > (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id.* (internal quotation marks and footnotes omitted); *accord Kaucher v. County of Bucks*, 455

F.3d 418, 431 (3d Cir. 2006).[5] To prevail on her claim, Plaintiff must establish all four of the foregoing essential elements. *See Sanford*, 456 F.3d at 311. Viewing all facts and inferences in the light most favorable to her, the Court concludes that Plaintiff's claims fail to satisfy at least two of the necessary elements.[6]

        *1.     The State Actors Did Not Act With A Degree of Culpability That Shocks The Conscience.*

In *Rochin v. California*, 342 U.S. 165 (1952), the Supreme Court established that violations of substantive due process occur when state action shocks the conscience. *Id.* at 172. In *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), the Court reiterated the proper standard for gauging the seriousness of alleged substantive due process violations: "Our cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be arbitrary in the constitutional sense . . . . To this end, for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Id.* at 846 (internal quotation marks and citations omitted).

In *Sanford*, the Court of Appeals incorporated into the "state-created danger" doctrine three possible standards gleaned from previous cases to determine whether state action shocked

---

[5] Plaintiff urges that the second prong of the test requires only deliberate indifference rather than action that shocks the conscience. In *Sanford*, the Court of Appeals explained that conscience-shocking is always the legal standard; nevertheless, when the state actor could engage in "actual deliberation" or "unhurried judgments," "deliberate indifference, or perhaps gross negligence or recklessness, could be sufficient" to shock the conscience. 456 F.3d at 306, 310.

[6] For purposes of this Memorandum Opinion, the Court assumes without deciding that Plaintiff "has raised an issue of fact for summary judgment purposes as to the first and third prongs." *Sanford*, 456 F.3d at 305 n.6. However, the Court notes that in an unpublished decision in a similar public school violence case, the Court of Appeals held that it "cannot find that the attack was a fairly direct result of any lack of surveillance or monitoring" on the part of the school, thereby precluding the plaintiff from establishing the first prong to survive summary judgment. *Mohammed v. Sch. Dist. of Phila.*, 196 Fed.Appx. 79, 82 (3d Cir. 2006).

the conscience: (1) deliberate indifference; (2) gross negligence or arbitrariness that indeed shocks the conscience; or (3) intent to cause harm. 456 F.3d at 306. The initial question, then, is whether, under the particular factual circumstances of the instant case, deliberate indifference or something more is sufficient to shock the conscience. As noted in footnote 5, *supra*, the Court of Appeals has drawn a distinction between urgent situations and situations in which state actors have the time and "luxury of proceeding in a deliberate manner." *Rivas*, 365 F.3d at 195; *see also Sanford*, 456 F.3d at 309 ("The level of culpability required to shock the conscience increases as the time state actors have to deliberate decreases.").

In the instant case, deliberate indifference is the proper standard because Defendants had over three years to attempt to stop the bullying and violence inflicted upon Jackson. Once the first incident occurred in third grade, Defendants could engage in "relaxed deliberation" regarding how to protect Jackson. *Sanford*, 456 F.3d at 308. The intuitive appeal of this less rigorous standard is apparent. For example, had Plaintiff been told by School officials that nothing would be done despite having sufficient time to implement a proper course of action, then a rational jury could find that such deliberate indifference shocked the conscience. This factual scenario stands in stark contrast to high-speed police chases and prison riots, contexts in which "a deliberate indifference standard does not adequately . . . convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Schieber*, 320 F.3d at 418-19.

Even though deliberate indifference suffices to shock the conscience in the case at bar, Plaintiff nonetheless fails to establish a genuine issue of material fact that the District or any of its agents acted with deliberate indifference. Indeed, at each and every turn, Defendants

10

responded positively, not indifferently, let alone deliberately so. First, following the pushing incident in third grade, Jackson's homeroom teacher moved the offender to a desk in the back of the room in a corner. Second, following the chasing and pushing incidents in fourth grade, Jackson's principal suspended the culprits for three days. Third, following the chasing incident in the art room in fifth grade, Jackson's teacher positioned herself close to Jackson. Fourth, following the subsequent chasing and kicking incident, Jackson's principal suspended the culprit for three days. Ultimately, following the brick chasing incident, the District permitted Jackson and his brother to leave school fifteen to twenty minutes early each day, even though this was a special exemption from the District's general policy. By contrast, indifference would have meant no suspensions, no discipline, no parent-administration dialogue, and no special authorizations.

Although she admits all the foregoing facts, Plaintiff argues that the District was deliberately indifferent for not implementing measures, especially security measures, that would have curbed the levels of violence and bullying at the School as a whole. These measures include, *inter alia*, employing actual police officers with the power to arrest and providing busing so that it is clear the District is responsible for students' safety "until they got home from school." The failure to implement these School-wide measures does not constitute deliberate indifference toward Jackson as a matter of law, however. *See Mohammed v. Sch. Dist. of Phila.*, 196 Fed.Appx. 79, 81-82 (3d Cir. 2006).

The case factually most similar to the one at bar is *Stevenson v. Martin County Board of Education*, 3 Fed.Appx. 25 (4th Cir. 2001) (per curiam). In *Stevenson*, the Fourth Circuit acknowledged that "[t]he school surely could have done more to protect [the minor plaintiff], given the frequent and brutal attacks by [a named student] and others. But the failure to protect

11

by itself is not sufficient to trigger constitutional liability in this situation" and did not reach the level of deliberate indifference. *Id.* at 32. Further, like the defendant guidance counselor in *Sanford*, the School agents in this case "did not simply ignore" the various incidents. 456 F.3d at 311. Accordingly, because no rational jury could conclude from the record evidence that Defendants were deliberately indifferent to Jackson's plight, they did not act with a degree of culpability that shocks the conscience.

> 2. *The State Actors Did Not Affirmatively Use Their Authority In A Way That Created A Danger To Jackson Or That Rendered Him More Vulnerable To Danger Had They Not Acted At All*

Even assuming, *arguendo*, that Plaintiff could satisfy the second element of the state-created danger test, she plainly fails to satisfy the fourth element, which requires that a state actor affirmatively use his or her authority to create a danger. The Court of Appeals in *Bright* stressed "that under the fourth element of a state-created danger claim, '[l]iability . . . is predicated upon the states' *affirmative acts* which work to the plaintiffs' detriments in terms of exposure to danger.' It is misuse of state authority, *rather than a failure to use it*, that can violate the Due Process Clause." 443 F.3d at 282 (second emphasis added) (quoting *D.R. by L.R.*, 972 F.2d at 1374). Plaintiff confuses the necessary with the sufficient when she argues that "whether a defendant's influence is properly characterized as an affirmative act or an omission is not determinative." Pl. Br. at 6. Although Plaintiff's statement may have been a reasonable interpretation of older cases, *Bright* demonstrates that it is inconsistent with current law. *See* 443 F.3d at 283 n.7; *see also Kaucher*, 455 F.3d at 432 ("[A] specific and deliberate exercise of state authority, while necessary to satisfy the fourth element of the test, is not sufficient. There must be a direct causal relationship between the affirmative act of the state and plaintiff's

12

harm."). And *Sanford* reaffirmed *Bright*'s requirement by holding that the plaintiff in that case failed by attempting to "recharacterize" the defendant's actions as "affirmative actions" because failure to prevent harm simply does not constitute causing harm. *Sanford*, 456 F.3d at 312.

In the instant case, while Plaintiff purports to challenge Defendants' "actions," her claim depends entirely on their omissions. Whatever *further* measures Defendants could have taken to protect Jackson, the affirmative actions they took did not leave Jackson "more vulnerable to danger than had the state not acted at all." *Bright*, 443 F.3d at 281.[7] Indeed, as described in subsection IV.A.1, *supra*, the District and its agents took some ameliorative action after each incident of student misconduct directed at Jackson. Hence, rather than show an affirmative use of authority to render Jackson more vulnerable, each of Defendants' actions shows an affirmative use of authority to discipline the offenders and attempt to remove Jackson from dangerous situations. Whether Jackson's situation actually improved is not the legal test; the record is clear that Defendants acted on every occasion with the good faith intention of improving it. *See, e.g.*, *Stevenson*, 3 Fed.Appx. at 27-28 (minor plaintiff's situation "reached a new low" after the bullies were suspended and "picked a fight with [minor plaintiff] in retaliation for [the] suspension"). Therefore, Plaintiff has not adduced sufficient evidence to meet the fourth *Bright* element to survive summary judgment.

        3.    *An Eastern District Of Pennsylvania Case That Predates* Bright, Kaucher, *And* Sanford *Does Not Change The Outcome In This Case*

In response to the substantial legal authority against her position, Plaintiff relies heavily

---

[7] Plaintiff does not allege that the various disciplinary actions the District *did* take made her son's situation worse, for doing so would have failed to satisfy *Kaucher*'s rule that there "be a direct causal relationship between the affirmative act of the state and plaintiff's harm." 455 F.3d at 432.

13

on *Gremo v. Karlin*, 363 F. Supp.2d 771 (E.D. Pa. 2005). There are several reasons why *Gremo* does not control here. First, sister district court decisions, although entitled to careful consideration and some deference, are not binding. Second, *Gremo* was decided on a Rule 12(b)(6) motion to dismiss, *id.* at 780, which sets a lower bar for the nonmoving party than a Rule 56 motion for summary judgment. Third, *Gremo*'s articulation of the relevant legal test is outdated in light of *Bright*, *Kaucher*, and *Sanford*. See *id.* at 783.

Finally, the facts in *Gremo* are distinguishable from those in the instant case. First, in *Gremo*, there was evidence of "attempts by the School District of Philadelphia, school administrators, principals, teachers, and security personnel to conceal violent incidents and under-report the number of violent assaults that occurred throughout the school system for a period of over two years." *Id.* at 778. That concealment permitted the "perpetrators [to be] confident in their ability to continue their attacks in the open." *Id.* at 790. By contrast, there is no record evidence in this case that any Defendant "concealed" what happened to Jackson or any other student. To the contrary, actions such as partnering with the University of Pittsburgh and forming the "Solutions Team" belie the notion that Defendants were trying to conceal student violence. There is also no evidence that ProSoft "under-reported" the number of violent assaults. Nor in this case is there any evidence of "an attitude and atmosphere" on the part of Defendants to tolerate violence. *Id.* In addition to Defendants' actions just described, Plaintiff's own amended complaint alleges that District officials told a local television reporter that they were tolerating student misconduct "less." The repeated suspensions of students who bullied Jackson and the hiring of security guards are further indications that the level of violence was not accepted or acceptable to Defendants. Finally, the school nurse in *Gremo* performed but a

14

cursory examination of the minor plaintiff even though he suffered significant injuries. *Id.* at 780. In this case, there is no allegation that a School nurse failed in her duty to treat Jackson adequately following an attack. Accordingly, *Gremo* is inapposite.

  B.  *Plaintiff Has Failed To Demonstrate A Deliberate Pattern Or Practice*

  In this case, Plaintiff has sued the Duquesne School District. Before the District can be held liable, the Court must first determine "whether plaintiff's harm was caused by a constitutional violation." *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). Because the Court has already ruled against Plaintiff on that issue, judgment must be entered in favor of the District. *See Mohammed v. Sch. Dist. of Phila.*, 355 F. Supp.2d 779, 787 (E.D. Pa. 2005), *aff'd*, 196 Fed.Appx. 79 (3d Cir. 2006); *see also Stevenson*, 3 Fed.Appx. at 33 ("An award of damages against a municipality based on the actions of its officers is not available unless the officers' conduct amounted to a constitutional injury. . . . Because we have already determined that [minor plaintiff]'s allegations do not amount to a §1983 violation on the part of the school officials, it follows that the school board likewise cannot be held constitutionally liable."). But even assuming, *arguendo*, that Plaintiff has established a constitutional violation under the "state-created danger" theory, the District has an additional defense because the law is clear that a government entity cannot be liable merely because its agents are tortfeasors. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978).

> The Supreme Court in *Monell* . . . held that a municipality can be held liable as a person under [§]1983 when it unconstitutionally implements or enforces a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the officers of that municipality. By contrast, the Court expressly rejected municipal §1983 liability based on a *respondeat superior* theory, finding Congress did not intend municipalities to be held liable

>unless action pursuant to official municipal policy of some nature caused a constitutional tort.

*Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir. 2000) (internal quotation marks and citations omitted).

Plaintiff claims that the District had policies or customs in place, including failure to address safety concerns, failure to train employees, failure to be responsible for the transportation of students from school, and failure to hire security personnel who had arrest authority, which caused the attacks on Jackson. There are several problems with this argument. First, Plaintiff bears the burden of identifying the policy or custom that amounts to deliberate indifference. *See Black by Black v. Indiana Area Sch. Dist.*, 985 F.2d 707, 712 (3d Cir. 1993). Here, the record evidence demonstrates that the District's policies and practices sought to curb violence. Hence, Plaintiff has fallen well short of carrying her burden against the District.

Furthermore, Plaintiff's theory would make governmental entities liable for any shortcoming in security policies, even though they have otherwise implemented as much as possible under budgetary or political constraints. *See Carswell v. Borough of Homestead*, 381 F.3d 235, 245 (3d Cir. 2004) ("'In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a §1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident.' Permitting a lesser standard than deliberate indifference would 'engage the federal courts in an endless exercise of second-guessing municipal employee training programs. This is an exercise we believe the federal courts are ill suited to undertake as well as one that would implicate serious questions of federalism." (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989))).

16

Finally, there is no "direct causal link" between the policies alleged and Jackson's constitutional injury. *See id.* at 244; *see also Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 144 n.1 (3d Cir. 2002). Unlike in cases where "inadequate training" has been sufficient to sustain a *Monell* claim, *see, e.g., Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996), here there is no nexus between any alleged lack of training and a constitutionally suspect affirmative act, for Plaintiff has pointed to no affirmative act. Again, there is no evidence that but for the District's less-than-maximum security policies, Jackson would not have been attacked. Accordingly, no rational jury could find that Plaintiff has established a meritorious *Monell* claim.

## V.   Conclusion

In sum, although the Court is naturally sympathetic to the plight of Allen Jackson, Jr., his mother cannot prevail on her §1983 claim because she has not established a constitutional violation under the "state-created danger" doctrine. Furthermore, she has not produced evidence to demonstrate that any alleged constitutional violations were the result of policies or customs of the District that proximately caused Jackson's injuries. Thus, summary judgment is appropriate.

An appropriate order follows.

February 27, 2007

*Thos M. Hardiman*
Thomas M. Hardiman
United States District Judge